IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

   Plaintiff,

v.               No. 18-CR-2209 JAP

ERIC MADRID MENDOZA,

   Defendant.

## MEMORANDUM OPINION AND ORDER

On July 10, 2018, a federal grand jury indicted Defendant Eric Madrid Mendoza with three counts of transporting an alien in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(A)(v)(II). (Doc. 21). On January 23, 2019, Defendant filed a Motion to Suppress (Doc. 35), asking the Court to suppress all evidence and statements that officers obtained from Defendant's detention and subsequent arrest on June 18, 2018. The United States opposes the Motion, and it is fully briefed.[1] The Court heard evidence and argument from counsel at a hearing on March 12, 2019. Assistant United States Attorneys Jason Wisecup and Sarah Mease appeared on behalf of Plaintiff, United States of America. Defendant was present in the courtroom and represented by Assistant Federal Public Defender Amanda Lavin. Having considered the parties' briefs, arguments, evidence, and relevant case law, the Court will deny Defendant's Motion.

## BACKGROUND

On the morning of Monday, June 18, 2018, New Mexico State Police Officer Hermilo Lucero was driving eastbound on Interstate 40 in Bernalillo County, New Mexico. Officer Lucero

---

[1] *See* UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (Response) (Doc. 36); REPLY TO UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (Reply) (Doc. 40).

has worked as a New Mexico State Police officer since around 2015. He previously worked for the New Mexico Motor Transportation Division from 2002 until it was subsumed by the New Mexico State Police in 2015. (Tr. 4:12-20).[2] For the past two years, Officer Lucero has participated in the Homeland Security Investigations' (HSI) Border Enforcement Security Task Force (BEST), which he describes as assisting in investigation of crimes involving drugs, weapons, and human smuggling. (Tr. 5:1-5). Throughout his career, Officer Lucero has encountered numerous vehicles during traffic stops where he suspected human smuggling. (Tr. 5:6-19). Officer Lucero described I-40 as a "major highway for criminal activity" and testified that based on his training and experience he knows Interstate 40 to be a major route from the west coast to the east coast for gun, drug, and human smuggling. (Tr. 6:5-10; 35:4-5; 35:21-36:3).

Officer Lucero began pacing a Honda SUV on eastbound Interstate 40 that was driving five miles per hour above the 65 mile per hour (mph) posted speed limit.[3] (Dash Cam, 7:57:57-7:59:10). At approximately 7:59 a.m., Officer Lucero engaged his patrol vehicle's lights and pulled the Honda SUV over near mile marker 155 in the city of Albuquerque. (Dash Cam, 7:59:10-7:59:46). Officer Lucero approached the passenger side window of the vehicle, informed the driver that he stopped the vehicle for driving 70 mph in a 65-mph zone, and requested the driver's license and the vehicle registration and insurance. (Dash Cam, 8:00:07; Def. Ex. A, Tr. at 1). The driver, Luis Alberto Salazar, informed Officer Lucero that he did not have a driver's license, but he had a Mexican voter identification card. (Def. Ex. A, Tr. at 1). Officer Lucero observed that Mr. Salazar's hand was shaking "uncontrollably" when he handed Officer Lucero his identification.

---

[2] References to the transcript are to the Court Reporter's unedited rough transcript. Page and line numbers in any final transcript requested by a party may differ.

[3] The dash camera recording from Officer Lucero's patrol vehicle never displays a speed of 70 mph. Officer Lucero testified that the dash camera has a one-minute delay and would not have captured the moment Officer Lucero first observed the vehicle traveling above the posted speed limit and began following the vehicle. Officer Lucero stated that the vehicle slowed when he began following it. (Tr. 18:2-8).

(Tr. 7:7-9). While requesting this information, Officer Lucero noticed that the vehicle's seats were full with a total of seven occupants. (Tr. 11:8-11; 20:21-22). The occupants in the back appeared to be very nervous and scared with a "deer in headlights" look on their faces. (Tr. 7:25; 8:23-25). The occupants in the back of the vehicle appeared very young, causing Officer Lucero to wonder why they were not in school on a Monday morning or with a parent or guardian. (Tr. 7:23-8:7; 16:23-17:2). Officer Lucero also detected a "bad body odor" in the vehicle that he testified was consistent with people being smuggled who do not have the ability to take care of their personal hygiene. (Tr. 7:1; 9:9-14; 10:18-25). Finally, Officer Lucero observed that there was lot of luggage in the cargo area. He testified that a large amount of luggage was consistent with trafficking victims who often have their whole lives with them in suitcases. (Tr. 9:15-19). Officer Lucero testified that he suspected human trafficking as soon as he saw the men sitting in the back of the vehicle. (Tr. 36:6-9).

Officer Lucero asked Mr. Salazar to step out of the vehicle and back to Officer Lucero's patrol unit where he normally conducts business. (Def. Ex. A, Tr. at 2; Dash Cam, 8:00:45-8:01:02). Believing there were indications of human smuggling, Officer Lucero had Mr. Salazar wait at the front of his patrol vehicle while he called his supervisor and asked for guidance. (Def. Ex. A, Tr. 2; Dash Cam, 8:01:03; Tr. 11:12-19). Officer Lucero's supervisor advised Officer Lucero that he was going to send HSI to the scene to investigate further. (Tr. 11:16-19). The dashcam video reflects an approximately forty-second period during which Officer Lucero appears to be inside of his patrol vehicle with some radio chatter before exiting the vehicle to return to Mr. Salazar. (Dash Cam, 8:01:10-8:01:53). While waiting for immigration officials to arrive, Officer Lucero continued to address the speeding violation. Around 8:02 a.m., Officer Lucero asked Mr. Salazar a series of questions in Spanish regarding the men's travel. (Def. Ex. A, Tr. at 2; Dash

Cam, 8:02:01-8:02:28). Mr. Salazar stated that the men were traveling from California to Amarillo, Texas for work. (Def. Ex. A, Tr. at 2). Officer Lucero also collected Mr. Salazar's identifying information such as address, height, weight, eye color, and date of birth. (Def. Ex. A, Tr. at 3-4). Mr. Salazar informed Officer Lucero that the vehicle belonged to his friend, the passenger Defendant Madrid Mendoza, but that because Defendant was tired Mr. Salazar helped him with the driving. (Def. Ex. A, Tr. at 4).

At approximately 8:06 a.m., Officer Lucero advised Mr. Salazar that he was just going to give him a warning. (Def. Ex. A, Tr. at 5; Dash Cam 8:06:12). Officer Lucero stated that he was first going to check some numbers in the Honda SUV, noted that he would need to open the driver's side door, and asked Mr. Salazar if this was okay. (Def. Ex. A, Tr. at 5). Mr. Salazar consented, and Officer Lucero walked to the driver's side of the Honda and checked the VIN and the federal sticker which appeared to match with the other vehicle information Officer Lucero had. (Def. Ex. A, Tr. at 5; Dash Cam, 8:08:21). While looking at the numbers, Officer Lucero made contact with Defendant, who was seated in the front passenger seat. Defendant answered Officer Lucero's questions about vehicle ownership and the men's travel plans. (Def. Ex. A, Tr. at 6). Defendant confirmed that the vehicle was his, and stated that the men were heading to Amarillo to do construction work for about a month. (Def. Ex. A, Tr. at 6). Officer Lucero returned to the patrol vehicle at approximately 8:09 a.m. to finish processing the warnings – one for speeding and the other for driving without a license. (Dash Cam, 8:09:51). A printer problem delayed the process, but at 8:15 a.m. Officer Lucero began reviewing the two warnings with, and obtaining signatures from, Mr. Salazar. (Def. Ex. A, Tr. at 7-8; Dash Cam, 8:12:15-8:15:19; Tr. 29:25-30:2). Finally, at around 8:19 a.m., Officer Lucero returned Mr. Salazar's documents, advised Mr. Salazar that it

was okay for him to continue driving in place of his sleepy friend, and told him to have a good trip. (Def. Ex. A, Tr. at 8; Dash Cam, 8:19:00-8:19:19).

Mr. Salazar turned and took two steps towards the Honda SUV when Officer Lucero called out to him and asked if he could talk to Mr. Salazar a little bit. (Def. Ex. A, Tr. at 8; Dash Cam, 8:19:21). Mr. Salazar responded affirmatively and turned back to the patrol vehicle. (Def. Ex. A, tr. at 8). Officer Lucero testified that had Mr. Salazar responded that he did not want to answer any further questions, Officer Lucero would have detained him until HSI officials arrived. (Tr. 14:4-9; 31:4-8). However, because Mr. Salazar agreed to speak more, Officer Lucero proceeded to ask Mr. Salazar additional questions about the purpose of the men's travel to Amarillo. (Tr. 14:10-16). Mr. Salazar informed Officer Lucero that the men were planning to work on some apartments for a company called Canyon Placeres for what he thought would be a two to three-week time period. He noted that the company would pay for half of the hotel room and that he was responsible for the other half. (Def. Ex. A, Tr. at 8-10).

At approximately 8:21 a.m., Officer Lucero told Mr. Salazar to stand by the patrol vehicle for a moment, and Officer Lucero approached the passenger side window of the Honda SUV once again. (Def. Ex. A, Tr. at 10; Dash Cam, 8:21:40). Officer Lucero stated to Defendant in Spanish, "Hey sir, you know, you're free to go but is it okay for me to speak to you a little?" Defendant answered "yes." (Def. Ex. A, Tr. at 10). Officer Lucero testified that had Defendant declined, Defendant would not have been free to leave because Officer Lucero was waiting for the HSI agents to arrive to conduct further investigation. (Tr. 16:7-13; 33:13-17). As he had with Mr. Salazar, Officer Lucero asked Defendant several questions about the purpose of the men's travel and their work. Defendant confirmed that the men were traveling to Amarillo for work but indicated that the name of the company was Triple A Roof and that he thought the work would

last for about a month. Defendant also stated that the men did not yet know where they were going to stay, but that the company was going to provide a hotel or apartment. Officer Lucero then asked the occupants in the back of the vehicle for their ages. Several of the occupants responded. (Def. Ex. A, Tr. at 10-12).

At 8:23 a.m., Officer Lucero returned to and briefly entered his patrol vehicle. (Dash Cam, 8:23:37). About two minutes later, he again exited his vehicle and asked Mr. Salazar additional questions. (Dash Cam, 8:25:41; Def. Ex. A, at 12-13). Officer Lucero returned to the patrol vehicle at 8:26 a.m., and approximately thirty seconds later an HSI agent arrived on scene. (Dash Cam, 8:26:42-8:27:07). The HSI official, joined shortly thereafter by a second HSI official, arrested Mr. Salazar, Defendant, and the other occupants of the vehicle, and transported them to the Homeland Security Office. Once in custody, Defendant, the driver, and three of the five backseat passengers admitted that they did not have lawful status in the United States. After being advised of his *Miranda* rights, Defendant made several incriminating statements.

## LEGAL STANDARD

"The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. Suppression of evidence is an appropriate remedy only when the evidence is obtained in violation of a person's constitutional rights. *United States v. Gama-Bastidas,* 142 F.3d 1233, 1238 (10th Cir. 1998). In deciding a motion to suppress, the Court views the evidence in the light most favorable to the United States. *United States v. Guerrero-Espinoza,* 462 F.3d 1302, 1305 (10th Cir. 2006).

## ANALYSIS

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. Const. amend IV. A traffic stop is a "seizure" within the meaning of

the Fourth Amendment. *United States v. Guerrero-Espinoza,* 462 F.3d 1302, 1307 (10th Cir. 2006). The Government bears the burden of proving that a seizure was reasonable. *United States v. De La Cruz,* 703 F.3d 1193, 1196 (10th Cir. 2013). In considering whether an investigative detention was reasonable, the Court engages in a two-part inquiry, "asking first whether the detention was justified at its inception, and second, whether the agents' actions were reasonably related in scope to the circumstances initially justifying the detention." *Id.*

Officer Lucero stopped the vehicle in which Defendant was a passenger for driving above the posted speed limit, and Defendant does not dispute that the traffic stop was "justified at its inception." Rather, the critical inquiry is whether Officer Lucero "appreciably prolonged" the stop in violation of the Fourth Amendment. *Id.* at 1203. Defendant claims that Officer Lucero asked a series of questions that exceeded the scope of the traffic violation and measurably extended the stop. (Doc. 35 at 16). Defendant further argues that, even if Officer Lucero's questioning of Mr. Salazar, Defendant, and the other passengers while issuing the warning citations was justified, Officer Lucero unlawfully prolonged the initial traffic stop beyond the time necessary for issuing the warning citations without reasonable suspicion of criminal activity and without consent in order to await arrival of HSI officials. (Doc. 35 at 16-17). Accordingly, Defendant asks the Court to suppress all statements and evidence obtained from the alleged illegal detention on June 18, 2018, as well as evidence obtained from Defendant's subsequent arrest as "fruit of the illegal detention." (Doc. 35 at 12).

## A. The Initial Traffic Stop was Reasonable at Its Inception and No Longer Than Necessary

Officer Lucero's inquiries leading to issuance of the warning citations were within the scope of a routine traffic stop and did not measurably extend the stop. The reasonableness of a traffic stop depends on the detention and the manner in which it is carried out. *United States v.*

*Bradford,* 423 F.3d 1149, 1156 (10th Cir. 2005). An investigative detention must "last no longer than is necessary to effectuate th[e] purpose" of the stop. *Rodriguez v. United States,* ___ U.S. ___, 135 S. Ct. 1609, 1614 (2015). In the case of a traffic stop, that purpose is "to address the traffic violation that warranted the stop." *Id.* The Tenth Circuit has further held "that officers may engage in questioning on any subject that has a de minimis effect on the duration of the traffic stop." *De La Cruz,* 703 F.3d at 1204. Also, "[a]n officer…may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez,* 135 S. Ct. at 1615.

As part of a routine traffic stop, an officer may ask for a driver's license and vehicle registration, inquire about travel plans, run a computer check, and issue a citation. *United States v. Moore,* 795 F.3d 1224, 1229 (10th Cir. 2015). A vehicle identification number (VIN) inspection is also constitutionally permissible. *See New York v. Class,* 475 U.S. 106, 115 (1986) (concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop"). "If a driver cannot provide a driver's license, a police officer is entitled to ask questions regarding identity." *United States v. Reyes-Vencomo,* 866 F. Supp. 2d 1304, 1337 (D. N.M. Feb. 13, 2012). However, "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United States v. Villa,* 589 F.3d 1334, 1339 (10th Cir. 2009).

Officer Lucero's original reason for the stop was a minor traffic violation. He accordingly requested from Mr. Salazar a driver's license, vehicle registration, and insurance. Mr. Salazar admitted that he did not have a license, and instead provided Officer Lucero with a Mexican voter

identification card. Consequently, it was not outside the scope of the initial traffic stop for Officer Lucero to follow up with questions to verify Mr. Salazar's identity and gather information that would otherwise be included on a driver's license and necessary to complete the warning citations. Nor was it inappropriate or beyond the proper scope of the stop for Officer Lucero to inquire about Mr. Salazar's travel plans. Mr. Salazar confirmed that it was okay for Officer Lucero to open the vehicle's driver side door to check the VIN number on the doorjamb. While conducting the VIN inspection, Officer Lucero asked the passengers about ownership of the truck and their travel plans. These questions were within the scope of the stop and regardless did not unreasonably prolong the stop. Finally, it is evident from the dashcam video and Officer Lucero's testimony that Officer Lucero experienced some delay in issuing the written warnings because of a printer problem. Officer Lucero testified that he made several calls to his supervisor and HSI Agent Knoll while printing the citations, but there is no evidence that these calls unlawfully prolonged the stop. Moreover, as described further below, Officer Lucero had reasonable suspicion of human smuggling to extend the detention.

Approximately nineteen minutes after Officer Lucero initiated the traffic stop, Officer Lucero provided Mr. Salazar with the warnings, returned Mr. Salazar's paperwork, responded to Mr. Salazar's question, and told Mr. Salazar to have a good trip. At that point, Mr. Salazar turned to leave. The Court concludes that this completed the traffic stop, and that Officer Lucero's actions leading up to the point where Mr. Salazar turned to leave were reasonable, within the permissible scope of the initial traffic stop, and did not violate Defendant's Fourth Amendment rights.

### B. Officer Lucero Had a Reasonable Articulable Suspicion that Criminal Activity Was Occurring to Continue Defendant's Detention

Seconds after Mr. Salazar turned to leave and stepped towards the Honda SUV, Officer Lucero called out to him, asking if he could talk to Mr. Salazar "a little." Mr. Salazar turned back

around and returned to Officer Lucero's patrol vehicle, responding "yes." Officer Lucero then proceeded to ask Mr. Salazar additional questions about his travel, his relationship to the other vehicle occupants, the men's work plans for Amarillo, and where Mr. Salazar and the others planned to stay. After approximately three minutes of additional questioning, Officer Lucero told Mr. Salazar to wait by the patrol vehicle. Officer Lucero then approached the front passenger side window of the Honda SUV and began asking questions of Defendant and the backseat passengers. Additional questioning of Mr. Salazar, Defendant, and the other vehicle occupants, continued for approximately eight minutes, interrupted only by short pauses where Officer Lucero entered and exited his patrol vehicle and finally by the arrival of HSI officials.

The Tenth Circuit has held that extending a detention for further questioning beyond that related to the initial stop is permissible in two circumstances: (1) if the officer "has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring," or (2) "if the initial detention has become a consensual encounter." *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir. 1998). Defendant contends that, even if the Court were to determine that Officer Lucero's actions while preparing the written warnings were justified, the approximately eight minutes of additional questioning was not consensual and was not based on an articulable reasonable suspicion of criminal activity. Consequently, Defendant argues, Officer Lucero unconstitutionally extended the duration of the stop.

1. Defendant's Detention Did Not Become a Consensual Encounter

The Court first addresses whether the initial detention became a consensual encounter. A consensual encounter is voluntary and does not constitute a seizure within the meaning of the Fourth Amendment. *United States v. Gigley,* 213 F.3d 509, 514 (10th Cir. 2000). The government bears the burden of proving voluntary consent based on the totality of the circumstances. *United*

*States v. Bradford,* 423 F.3d 1149, 1159 (10th Cir. 2005). In this case, even assuming arguendo that Mr. Salazar voluntarily consented to Officer Lucero's initial additional questioning,[4] Mr. Salazar's consent cannot extend to Defendant. After telling Mr. Salazar to stay by the patrol car for a minute, Officer Lucero approached the passenger side window of the Honda SUV and told Defendant that he was "free to go." At the same time, Officer Lucero asked if he could speak with Defendant. Defendant, like Mr. Salazar, agreed to speak with Officer Lucero. However, it is not evident from the facts presented that Defendant was truly "free to go."

The circumstances in *United States v. Guerrero-Espinoza,* 462 F.3d 1302 (10th Cir. 2006) are akin to those here. In *Guerrero-Espinoza,* the driver of a vehicle in which the defendant was a passenger was stopped for a traffic violation. 462 F.3d at 1303. The trooper took the driver to the trooper's patrol car and eventually completed the traffic stop by issuing a warning, returning the driver's license, and letting the driver out of the patrol car. *Id.* at 1303-04. However, after the trooper told the driver he was free to go, the driver consented to further questioning. *Id.* at 1304. The trooper then returned to the front passenger side of the stopped vehicle to speak with the defendant. *Id.* at 1306. The defendant answered the trooper's questions and ultimately agreed to allow the trooper to search the vehicle. *Id.* The defendant challenged the stop, arguing that it did not evolve into a consensual encounter as to him. *Id.* at 1304. The Tenth Circuit agreed, holding that because the defendant did not know the traffic stop had officially ended, he could not voluntarily consent to the trooper's questioning. *Id.* at 1304 ("because the trooper completed the traffic stop outside [the defendant's] presence and because the released driver never returned to the minivan, a reasonable person in [the defendant's] position would not have realized the traffic stop had ended and he was free to leave").

---

[4] Officer Lucero testified at the hearing that had Mr. Salazar declined to speak with him further, Officer Lucero would have detained Mr. Salazar until HSI arrived because he suspected human smuggling.

Here too, the traffic stop officially ended outside of Defendant's presence and Mr. Salazar never returned to the vehicle.[5] In fact, Mr. Salazar was still standing by Officer Lucero's patrol car where he had been throughout the duration of the stop, and where Officer Lucero had ordered him to stay while Office Lucero approached the Honda SUV. There is no evidence that Defendant knew Officer Lucero had already returned Mr. Salazar's identification and completed the written warnings. Nor is there evidence that Defendant controlled the keys to the vehicle so he could simply drive off. Further, Officer Lucero was standing at the passenger side front door leaning in the window, thereby blocking Defendant's principal egress. Additionally, the vehicle was stopped on the side of a major interstate near a busy on-ramp. At the point Officer Lucero returned to the Honda SUV and began asking Defendant questions, a reasonable person in Defendant's position would not have realized the traffic stop had ended and that he was truly free to leave. Like the defendant in *Guerrero-Espinoza,* a reasonable person in Defendant Madrid Mendoza's position would not have felt free at that time to decline to answer Officer Lucero's questions and instead walk or drive away. The government has failed to meet its burden of proving that Defendant's consent to answer Officer Lucero's additional questions was voluntary.

2. <u>Reasonable Suspicion of Alien Smuggling Justified the Prolonged Detention</u>

Nevertheless, well before the traffic stop concluded, Officer Lucero developed a reasonable and articulable suspicion that alien smuggling was occurring which justified any additional investigative questioning and Defendant's continued detention. An officer may detain an individual for further questioning unrelated to the initial traffic stop if the officer develops a reasonable and articulable suspicion that illegal activity is occurring. *Hunnicutt,* 135 F.3d at 1349 (10th Cir. 1998). Officer Lucero is entitled to assess the facts in light of his experience detecting

---

[5] Moreover, at the moment Officer Lucero ordered Mr. Salazar to "stand here for a minute," while Officer Lucero went to speak to the vehicle occupants, the consensual encounter with Mr. Salazar ended.

human smuggling, and the Court must scrutinize his decision to prolong the traffic stop by examining the "totality of the circumstances." *United States v. Lopez-Martinez,* 25 F.3d 1481, 1484 (10th Cir. 1994).

As the Tenth Circuit recognized, "[t]o be sure, an officer's specific articulable facts, when viewed in isolation, will often comport with general notions of innocent travel rather than criminal activity." *Lopez-Martinez,* 25 F.3d at 1484. However, "[w]hen evaluating an officer's decision" to continue a traffic stop, the Court must not "engage in a sort of divide-and-conquer analysis by evaluating and rejecting each factor in isolation." *United States v. Cheromiah,* 455 F.3d 1216, 1221 (10th Cir. 2006) (internal quotation marks and citation omitted). "Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified" the continued detention. *Lopez-Martinez,* 25 F.3d at 1484.

Officer Lucero testified that, based on his experience, he had reason to believe there was human trafficking occurring as soon as he initiated contact with the occupants of the Honda SUV based on the following factors: (1) I-40 is a major west to east smuggling route; (2) the driver did not have a driver's license but instead produced, with his hand shaking "uncontrollably," a Mexican voter identification card; (3) there were seven people in the vehicle; (4) the occupants in the back of the vehicle appeared "really young," such that Officer Lucero thought they should be in school or with parents; (5) the occupants appeared "nervous," "scared" and had a "deer in headlights look,"; (6) the occupants in the back of the vehicle kept looking forward and not at Officer Lucero; (7) there was a strong body odor in the vehicle; and (8) there was a lot of luggage in the cargo area of the vehicle.[6] Later while asking "clarifying questions," Officer Lucero also

_____

[6] The Court finds as unreasonable, and will give no weight to, Officer Lucero's rationale that the large amount of luggage in the cargo area was consistent with alien smuggling because people being smuggled often carry their whole

discovered inconsistency between Mr. Salazar and Defendant's statements pertaining to the name of the company the men intended to work for in Amarillo, where they intended to stay, and who would pay for their rooms.

Several of the factors Officer Lucero cites, on their own, could certainly be interpreted as innocuous or consistent with innocent travel. For example, Officer Lucero noted that the vehicle's backseat passengers were nervous. "[W]hile a person's nervous behavior may be relevant," courts must be "wary of the objective suspicion supplied by generic claims that [an individual] was nervous" when confronted by law enforcement officers. *United States v. Barron-Cabrera,* 119 F.3d 1434, 1454 (10th Cir. 1997). In this case, however, the nervousness Officer Lucero observed and described was somewhat unusual. *See United States v. Davis,* 635 F.3d 1281, 1291-92 (10th Cir. 2011) (noting that "unusual signs of nervousness" may contribute to an officer's reasonable suspicion). Additionally, although Officer Lucero testified that Interstate 40 is a known smuggling route, it is also a road often heavily trafficked at 8:00 a.m. on Monday mornings by innocent commuters and travelers. Nevertheless, the Tenth Circuit has instructed that a district court should accord deference to an officer's ability to distinguish between innocent and suspicious action based on the officer's experience and training, *see United States v. Gandara-Salinas,* 327 F.3d 1127, 1130 (10th Cir. 2003), and should not view each factor in isolation, *Cheromiah,* 455 F.3d at 1221.

And Courts have recognized many of the factors observed by Officer Lucero as contributing to an officer's reasonable suspicion that alien smuggling was occurring. *See, e.g., United States v. Cota-Herrera,* 75 F. App'x 695, 698 (10th Cir. 2003) (unpublished) (the van's out of state license plates, the large number of individuals in the van, their tired appearance, and the

---

lives with them. In fact, it is often the lack of luggage on a long trip which arouses suspicion. *See, e.g., United States v. Cota-Herrera,* 75 F. App'x 695, 696 (10th Cir. 2003) (unpublished) (citing absence of luggage as one factor contributing to the officer's suspicion of alien smuggling); *United States v. Montano-Campa,* 37 F. App'x 448, 451 (10th Cir. 2002) (unpublished) (same).

smell emanating from the van were factors contributing to the officer's reasonable suspicion justifying a fifteen to twenty minute detention of the van until immigration officials arrived); *United States v. Gomez-Ascencio,* 108 F.3d 1388, at *3 (10th Cir. 1997) (unpublished) (finding an officer who had recent experience with arrest for alien smuggling had reasonable suspicion to support continued detention for further questioning based in part on "the van was filled with apparently Hispanic people, huddled under blankets, and without proper seats" and where the passengers and the defendant had inconsistent stories); *United States v. Calderon-Cochero*, 07-cr-1343-LH, 2007 WL 9733658, at *1 (D. N.M. Aug. 22, 2007) (where an officer conducting a valid traffic stop learned that the defendant only spoke Spanish, lacked a local driver's license, proof of insurance or registration and provided a Mexican identification card, officer had reasonable suspicion to justify calling Border Patrol and to detain the defendant for 30 minutes to await Border Patrol's arrival).

The Court concludes that the totality of the specific articulable facts, viewed in the light most favorable to the United States, reasonably prompted Officer Lucero to suspect that Defendant's Honda SUV was transporting undocumented aliens. A delay of eight minutes beyond the time the traffic stop ended to conduct further investigation and await immigration officials was not unreasonable. *See Cota-Herrera,* 75 F. App'x at 698 (officer had reasonable suspicion to justify a fifteen to twenty-minute detention of the van and its passengers until immigration officials arrived); *see also Calderon -Cochero,* 07-cr-1343-LH, 2007 WL 9733658, at *1 (D. N.M. Aug. 22, 2007) (officer had reasonable suspicion to justify a 30-minute detention to wait for Border Patrol). Accordingly, the Court will deny Defendant's motion to exclude all evidence of alien smuggling obtained from the June 18, 2018 stop. Defendant does not challenge HSI's probable cause to arrest him, but rather contends that any evidence obtained from his arrest must be

suppressed as fruit of the illegal detention. Because the Court concludes that the detention did not violate Defendant's Fourth Amendment rights, the fruit of the poisonous tree doctrine is inapplicable.

IT IS THEREFORE ORDERED THAT Defendant Eric Madrid Mendoza's Motion to Suppress (Doc. 35) is DENIED.

SENIOR UNITED STATES DISTRICT JUDGE